In the Matter of ALLEGED PROHIBITED POLITICAL ACTIVITY PHILADELPHIA REDEVELOPMENT AUTHORITY PHILADELPHIA, PENNSYLVANIA.

Misc. No. 77–144.

United States District Court,
E. D. Pennsylvania.

Dec. 22, 1977.

Peter A. Galante, Robert E. Gabriel, Philadelphia, Pa., for plaintiff.

Lynn R. Collins, Washington, D. C., John T. Murphy, Jr., Alexandria, Va., U. S. Civil Service Commission, for defendant.

1. Section 1502 provides in pertinent part:
   (a) A State or local officer or employee may not—

   . . . . .

   (2) directly or indirectly coerce, attempt to coerce, command, or advise a State or local officer or employee to pay, lend, or contribute anything of value to a party, committee, organization, agency, or person for political purposes; . . .
   The Hatch Act, as enacted in 1939, applied only to Federal employees. 5 U.S.C. § 7324 et seq.

## OPINION

DITTER, District Judge.

The question in this case is whether prior to the initiation of formal proceedings the United States Civil Service Commission (Commission) possesses subpoena power to aid in the investigation of alleged prohibited political activity. Movants seek to quash subpoenas served upon them which ordered the production of certain documents and required their attendance before Commission representatives for the purpose of giving testimony. For the reasons which follow, this motion must be denied.

### I. *The Factual Background*

In September, 1976, the Commission received complaints and information alleging that employees of the Redevelopment Authority of the City of Philadelphia (Authority), an agency receiving federal funds, were being systematically required to make financial contributions for political purposes in violation of 5 U.S.C. § 1502(a)(2) (the Hatch Act).[1] An investigation of these allegations was authorized and Commission representatives requested that the Authority provide certain documents pertaining to the Authority's organization, staffing, and funding. Permission to interview some current Authority employees with respect to the matter under investigation was also sought. These requests were refused by the Authority's executive director, Augustine A. Salvitti.

Pursuant to 5 U.S.C. § 1507(a),[2] the Commission issued a subpoena to Richard E. Malone, the deputy executive director, ordering production of 1) the names of current Authority employees, their titles and

By amendment in 1940, it was extended to cover state or local employees whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a federal agency.

2. That section provides, in part:
   The Civil Service Commission may require by subpena the attendance testimony of wit-

organizational units; 2) information as to persons employed on December 5, 1973, but no longer with the Authority; and (3) all documents pertaining to loans or grants made to the Authority by the United States since July 31, 1974. In addition, 18 employees, including Mr. Malone, were individually subpoenaed to be deposed before a Commission representative. These subpoenas were served, but the documents were not produced and no persons appeared at the time and place specified.[3] The Commission thereupon sought judicial enforcement of these subpoenas, also provided for in Section 1507(a),[4] and I issued an *ex parte* order directing compliance. By agreement of the parties that order has been suspended until this court resolves the issue of the Commission's authority.

II. *The Commission has the authority to issue subpoenas for investigatory purposes*

   a. The plain language of Section 1507 supports the Commission's position.

■ Movants, i. e., the Authority and the 18 individuals, argue that relevant sections of the Hatch Act disclose that it was the intent of Congress to give the Commission subpoena power at a formal hearing level but not at an investigatory stage. For support, they point to the continual references to a hearing in Section 1504[5] which deals with investigations and notices, Section 1505,[6] which sets out actions the Commission must take following a hearing, and one sentence extracted from Section 1507(a): "The attendance of witnesses and the production of documentary evidence may be required from any place in the United States at the designated place of hearing." They contend the cited language unmistakably demonstrates that if the Commission has sufficient evidence to warrant an investigation, it must proceed to a hearing where normal due process safeguards such as the right to counsel and cross-examination apply. I disagree.

While Sections 1504 and 1505 are somewhat pertinent, it is evident that Section 1507(b) disposes of movants' argument and demonstrates the availability of subpoena authority to compel depositions and the pro-

---

3. Actually, movants assert, the individuals did not refuse to be deposed; rather, once the Authority refused to produce the documents, the government then conceded there was no point in taking the depositions.

4. The section provides:
   In case of disobedience to a subpena, the Commission may invoke the aid of a court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence. In case of contumacy or refusal to obey a subpena issued to a person, the United States District Court within whose jurisdiction the inquiry is carried on may issue an order requiring him to appear before the Commission, or to produce documentary evidence if so ordered, or to give evidence concerning the matter in question; and any failure to obey the order of the court may be punished by the court as a contempt thereof.

    nesses and the production of documentary evidence relating to any matter before it as a result of this chapter. Any member of the Commission may sign subpenas, and members of the Commission and its examiners when authorized by the Commission may administer oaths, examine witnesses, and receive evidence . . .

5. When a Federal agency charged with the duty of making a loan or grant of funds of the United States for use in an activity by a State or local officer or employee has reason to believe that the officer or employee has violated section 1502 of this title, it shall report the matter to the Civil Service Commission. On *receipt of the report, or on receipt of other information which seems to the Commission to warrant an investigation,* the Commission shall—
   (1) fix a time and place for *hearing;* and
   (2) send . . . , to the officer or employee charged with the violation and to the State or local agency employing him a notice setting forth a summary of the alleged violation and giving the time and place of the *hearing.* The *hearing* may not be held earlier than 10 days after the mailing of the notice. (emphasis added). 5 U.S.C. § 1504.

6. Either the State or local officer or employee or the State or local agency employing him, or both, are entitled to appear with counsel at the *hearing* under section 1504 of this title, and be heard. After this hearing, the Civil Service Commission shall— . . . (emphasis added). 5 U.S.C. § 1505.

duction of documents at a stage other than a formal hearing. The subsection provides, in part:

> The Commission may order testimony to be taken by deposition *at any stage of the proceeding or investigation before it* as a result of this chapter (emphasis added).

That the Commission can require this testimony by way of subpoena is evident by reference to other language in Section 1507(b), i. e.:

> Any person may be compelled to appear and depose and to produce documentary evidence before the Commission *as provided by this section* (emphasis added).

"[A]s provided by this section" should not be limited to the provisions of subsection (b); rather, this phrase should be construed to include all the powers provided the Commission in Section 1507. Thus, the Commission may compel witness attendance and the production of other evidence by way of subpoena, as set out in Section 1507(a). In addition, and despite movants' contention to the contrary, Section 1507(b) also authorizes the Commission to seek the aid of this court in compelling attendance should the subpoenas be disobeyed.

b. The authority of other administrative agencies to issue subpoenas has been consistently upheld by the courts.

The Supreme Court has made it clear that this court's role in the enforcement of administrative process is limited. The first case to consider the issue was *Endicott Johnson v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), where the Court held that, on an application for enforcement of a subpoena issued by the Secretary of Labor, since the evidence sought by the subpoena was not "plainly incompetent or irrelevant to any lawful purpose," it was the district court's duty to order its production. *Id.* at 509, 63 S.Ct. at 343. Shortly thereafter, the Court applied the same principles to enforce subpoenas issued pursuant to an investigation under the Fair Labor Standards Act. *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Emphasizing the impor-

tance of the administrative mandate to search out violations of the Act, Justice Rutledge stated that the Wage and Hour Administrator may not act arbitrarily or in excess of his statutory authority, but "this does not mean that his inquiry must be 'limited . . . by . . . forecasts of the probable result of the investigation' . . . ." *Id.* at 216, 66 S.Ct. at 509, quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). Just four years later, in a case dealing with the investigative powers of the Federal Trade Commission, *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Court once more enunciated the standard: " . . . it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Id.* at 652, 70 S.Ct. at 369. In upholding a Commission order, Justice Jackson, speaking for the Court, distinguished the judicial subpoena, which is subject to specific constitutional limitations, from an administrative subpoena. He recognized that early in the history of administrative tribunals, courts had been persuaded to engraft judicial limitations, such as "no-fishing expeditions" on administrative processes, but that more recent decisions had removed this restriction on the administrative investigation. Justice Jackson likened an agency's investigatory powers to those conferred upon a grand jury which is empowered to investigate on suspicion alone without the necessity of showing probable cause:

> The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a

case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. *When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law* (emphasis added). *Id.* at 642–43, 70 S.Ct. at 364.

.    .    .    .    .

Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest. *Id.* at 652, 70 S.Ct. at 369.

Neither my research nor that of counsel has disclosed any decision which deals directly with the Commission's power to issue subpoenas under Section 1507. However, the above principles have been consistently followed in cases involving other administrative agencies in many federal courts.[7] The Third Circuit's treatment of this issue in *F.T.C. v. Standard American, Inc.*, 306 F.2d 231 (3d Cir. 1962), is particularly dispositive. There, in enforcing subpoenas issued by the Federal Trade Commission requiring certain persons to appear, give testimony, and produce documents before a designated Commission examiner, the court interpreted language [8] quite similar to the language which is at issue here, 5 U.S.C. § 1507.[9] In addition, this position is sup-

**7.** See, e. g., *Local 104, Sheet Metal Workers Int. Ass'n v. Equal Employment Opportunity Commission*, 439 F.2d 237 (9th Cir. 1971); *Federal Maritime Comm. v. Port of Seattle*, 521 F.2d 431 (9th Cir. 1975); *Federal Maritime Comm. v. DeSmedt*, 366 F.2d 464 (2d Cir.), cert. denied 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966); *F. T. C. v. Texaco, Inc.*, 180 U.S.App.D.C. 390, 555 F.2d 862 (1977); *F. T. C. v. Standard American, Inc.*, 306 F.2d 231 (3d Cir. 1962); *United States v. City National Bank*, 403 F.Supp. 345 (C.D.Cal.1975) (Interstate Commerce Commission subpoena for the production of bank records); *Application of Barnes*, 219 F.2d 137 (2d Cir. 1955) (Immigration and Naturalization Service subpoena requiring a naturalized citizen to testify enforced); *Shaughnessy v. Bacolas*, 135 F.Supp. 15 (S.D.N.Y.1955) (Immigration and Naturalization subpoena enforced); *United States v. Newman*, 441 F.2d 165 (5th Cir. 1971) (Internal Revenue Service summons to produce records enforced; *N. L. R. B. v. Costello*, 296 F.Supp. 1035 (D.Conn.1968) (employer required to comply with Board subpoena in the course of a representation proceeding); *United States v. Feaster*, 376 F.2d 147 (5th Cir.), cert. denied 389 U.S. 920, 88 S.Ct. 237, 19 L.Ed.2d 265 (1967) (National Mediation Board subpoena enforced against Alabama State Docks Department); *Securities and Exchange Comm. v. Howatt*, 525 F.2d 226 (1st Cir. 1975); *Securities and Exchange Comm. v. Kaplan*, 397 F.Supp. 564 (E.D.N.Y.1975).

**8.** Section 9 of the Federal Trade Commission Act, 15 U.S.C. § 49, provided at that time: For the purposes of . . . [this Act] the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. Any member of the Commission may sign subpoenas, and members and examiners of the Commission may administer oaths and affirmations, examine witnesses, and receive evidence.

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person, issue an order requiring such corporation or other person to appear before the Commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

The Act has since been amended to cover persons and partnerships as well. Pub.L. 93–637, 88 Stat. 2198 (1975).

**9.** Other language similar to that located in Section 1507 and 15 U.S.C. § 49 can be found in 46 U.S.C. § 1124 (Federal Maritime Commission)

ported in 1 *K. Davis, Administrative Law Treatise*, § 304, at 176 (1958 ed.), wherein Professor Davis states:

> Long-standing tradition permits the use of subpoenas in and of grand jury proceedings (footnote omitted). The authorities are now clear that the same may be done in aid of the administrative counterpart of grand jury proceedings—law enforcement investigations preceding the issuance of formal complaints.

Thus, even if I were to conclude that the Commission was attempting "in this case to cast twenty-two 'deposition' subpoenas in the hope that they may, when interwoven, serve as a 'fishing net' to catch a violator," Movants' Memorandum of Law in Support of a Motion to Quash at p. 9, it is clear from the case law interpreting the powers of similar administrative agencies that the Commission was legally within its authority to do so since the information sought is relevant and the inquiry is within the authority of the agency.

c. The legislative history to the 1940 Amendments demonstrates that Congress intended the Commission to have such authority.

A brief review of the legislative history of the 1940 amendments also demonstrates that Congress contemplated the Commission would inquire into alleged violations and would, therefore, require subpoena power to facilitate investigation.

The 1940 amendments, as originally introduced,[10] provided for a hearing, but only in connection with the determination by the Commission as to the amount of federal funds to be withheld if the Commission had found a violation. This gave rise to debate [11] between Senator John A. Danaher of Connecticut and the author of the legislation, Senator Carl A. Hatch of New Mexico, concerning whether the amendments had failed to provide an opportunity to be heard for a person formally charged with a viola-

and 2 U.S.C. § 437d (Federal Election Commission).

10. S. 3046, 76th Cong. 3d Sess. (1940), provided in section 12(b):

. . . Upon the receipt of any such report, or upon the receipt of any other information which seems to the Commission to warrant an investigation, the Commission shall determine whether any violation of such subsection has occurred. If the Commission determines that any such violation has occurred, it shall determine after reasonable notice and opportunity for hearing . . . and certify to the appropriate Federal agency the amounts of any loan or grant which should be withheld on account of such violation and whether any such amount should be withheld permanently or temporarily or conditionally . . . .

11. Mr. DANAHER. Mr. President, let me call to the Senator's attention the fact that by his own very language . . . the bill says:

"If the Commission determines that any such violation has occurred—"

Then there is a hearing as to how much the penalty shall be; but there is not any hearing first as to whether or not a violation has occurred.

Mr. HATCH. Let me explain that. I see the point the Senator makes . . . Of course, under the bill, anyone may make a complaint to the United States Civil Service Commission. . . . As the original bill was drawn, the Commission might have been justified in with-

holding funds right there, upon that complaint. We said, "No; the first thing the Commission must do is to investigate and see whether or not there has been any violation of the law."

The Senator was formally a prosecuting attorney. He always conducted investigations before he filed a complaint. He determined that the law had been violated before any hearing, even a preliminary hearing was held. So the Commission must investigate and must determine that there has been a violation of law. Having determined that fact, then notice and hearing are given.

We are just trying to take most orderly, commonplace steps. . . . It was our desire to give everybody a full opportunity to be heard. We want to be just as fair and reasonable with this measure as we can.

\* \* \* \* \* \*

Mr. DANAHER. . . . [I]t is perfectly clear that the Senator . . . wants to have a hearing after it has been determined that a violation has occurred. The hearing, however, is only on the penalty. It does not for one moment, in that language, provide for any hearing whatever for the person accused of violating the statute. Consequently, it would mean that an individual may lose his job and lose for 18 months his opportunity for a livelihood in any division of the State. Therefore, I believe we ought to amend the bill in that respect . . . 86 Cong.Rec. 2344, 2345 (1940).

tion of the law. As a result of this concern, Senator Danaher offered a proposal which was subsequently added to the package of 1940 amendments. That language now sets out, in Section 1504, the Commission's responsibilities in notifying and fixing a time and place for hearing.

Once the legislation reached the floor of the House of Representatives, Representative Robert Ramspeck of Georgia introduced an amendment to confer subpoena power upon the Commission. As originally submitted, the amendment would have given the Commission subpoena power to be used in any matter before it. However, the proposal was made subject to a point of order as going beyond the scope of the bill.[12] The amendment was then redrafted to apply to matters involving only state and local employees, reintroduced, and passed. With the exception of a few minor word changes, the current Section 1507 echoes Representative Ramspeck's amendment.

The only portion of the legislative history referred to by movants is the statement made by Mr. Ramspeck when the amendment was introduced for the second time. He stated:

> Mr. Chairman, I just want to say a word about this. The Civil Service Commission, under this law, is charged with an enforcement job which they did not seek and do not crave; but they have no power to subpena, and if you want them to do the job under this act they must have power. It is now limited to things arising under this act, and gives them the power to subpena persons and documents so that they can get evidence relating to violations that are charged. 86 Cong.Rec. 9463 (1940).

Movants rely on the words, "violations that are charged," in support of their position that subpoena power attaches only after the issuance of formal charges and the scheduling of a formal hearing. This argument ignores the prior cited statements and misconstrues Mr. Ramspeck's intent.

The debate between Senators Hatch and Danaher clearly shows that Congress foresaw the Commission as not only an enforcing agency but also one that would investigate. Moreover, when Representative Ramspeck mentioned that the Commission's power to subpoena "is now limited to things arising under this act," he was referring to the agency's authority under the existing Hatch Act, and he intended by his amendment to confer the additional authority to subpoena at any stage of the proceeding. For these reasons, I find that the legislative history points toward the conclusion that the Commission may issue subpoenas at the investigatory stage of a proceeding.

d. Prior investigation by way of subpoena constitutes good administrative practice.

Finally, the practice of investigating charges and then holding a hearing represents good administrative procedure. At the same time, it offers persons who may be subject to investigation the greatest protection.

Were the Commission to operate as movants suggest and proceed directly to the hearing stage on the basis of every complaint, however casual or unfounded it might be, each employee would be put in the position of a defendant at a formal hearing. This procedure at least establishes whether sufficient evidence exists to charge the employee officially with a violation and protects him from a malicious or irresponsible charge. In addition, conducting a hearing for every complaint made or violation

---

**12.** Mr. RAMSPECK. Mr. Chairman, there is no question about the fact that the authority conferred by this amendment could be used in other matters. It also relates, however, to the investigations and the hearings to be made by this bill.

.    .    .    .    .

Mr. RAMSPECK. That is correct, Mr. Chairman. It [the amendment] goes beyond the scope of this bill, but I point out that the Commission is directed in this bill to investigate complaints made under this act; and the purpose of this amendment is to give them the power to subpena, *which they do not now have under the civil-service law, to comply with the directions of this bill. Id.* at 9459. (emphasis supplied).

reported, in light of the number received by the agency, would constitute a tremendous administrative burden. As Senator Hatch stated, see note 11, supra, no prosecutor would file a complaint before he had first determined that a violation of the law had occurred. Logic and common sense dictate that the Commission should be given a similar opportunity to investigate and be provided with the right to subpoena to facilitate that investigation.

### III. *The Commission subpoenas are legally sufficient*

In addition to their attack upon the Commission's authority to issue subpoenas in aid of its investigation, movants also raise four challenges to the subpoenas themselves. They argue 1) the subpoenas fail to advise adequately the testimony sought is relevant to the Commission's investigation; 2) the subpoenas do not identify the individuals named as being either informational witnesses or targets of the investigation; 3) the scope of the investigation is not set out, and, therefore, the individuals are unable to consult effectively with counsel and intelligently exercise their right against self-incrimination; and 4) these subpoenas are unlawful because they have been issued by an administrative agency to develop a criminal action against the individuals subpoenaed and others.

I shall consider each of these arguments separately.

### a. The Commission need not establish the relevancy of the information sought.

██ Movants point to *In re Grand Jury Proceedings, Jacqueline Schofield*, 486 F.2d .85 (3d Cir. 1973), for the proposition that the Commission should be required to make some preliminary showing that the testimony it seeks is at least relevant to the investigation it is conducting. It is evident, however, that *Schofield* is distinguishable and has no application to the instant matter.

In *Schofield*, the government attempted, by way of grand jury subpoena, to have Mrs. Schofield furnish examples of her handwriting, be fingerprinted, and have her photograph taken. Upon her continued refusal to comply, she was adjudged in civil contempt by the district court and ordered confined until she had done so. On appeal, the Third Circuit found it reasonable to require the government to

"make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." *Id.* at 93.

But this principal should not be extended beyond the factual situation presented in *Schofield*. It involved a criminal proceeding and it is more than likely that the government intended to use the evidence sought in furthering the development of a criminal charge against Mrs. Schofield. As is the case with blood samples or a plaster cast of a footprint, she would not have been able to invoke a Fifth Amendment privilege against self-incrimination to have these items excluded from use against her. Moreover, it is clear that the court had a genuine concern over the possible abuse of the grand jury process:

"It seems to me that such a minimal requirement is almost indispensible if citizens are to be afforded minimum protection against the possible arbitrary exercise of power by a prosecutor through use of the grand jury machinery." *Id.* at 94 (Seitz, C. J., concurring).

██ The facts of this case are inapposite. The Commission simply seeks to take the testimony of 18 Authority employees and there is no indication at this time that the purpose is to further a criminal case against any one of them. See discussion in Part 3d, infra. Should the questioning reach a possibly incriminating area, they may then rely upon their Fifth Amendment

**1202**

rights.[13] In light of this protection, the government need not inform movants of the relevancy of the testimony sought.[14]

b. Movants need not yet be informed of their informational witness or target stature.

█ Although they cite no authority, movants insist that they should be advised whether they are to be questioned as only informational witnesses or as targets of the investigation. Otherwise, they argue, the Commission would be permitted to subpoena a so-called target during this investiga-

tory stage, extract from him derogatory or incriminating information and then, at the time of hearing, notify him that he could potentially forfeit his position because of unlawful political activity. The short answer to this contention is that it is premature. Without the documents and testimony subpoenaed, it is simply too early in the investigation to determine whether these employees or any others have engaged in prohibited political activity and, thus, to differentiate between informational and target witnesses. If Commission authorities were held to such a requirement, they

**13.** Movants could argue, although they have not, that they are not privileged to raise any Fifth Amendment protection or in the very least may be subjected to possible job forfeiture in light of Section 1507(c), which provides:

> A person may not be excused from attending and testifying or from producing documentary evidence or in obedience to a subpena on the ground that the testimony or evidence, documentary or otherwise, required of him may tend to incriminate him or subject him to a penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled to testify, or produce evidence, documentary or otherwise, before the Commission in obedience to a subpena issued by it. A person so testifying is not exempt from prosecution and punishment for perjury committed in so testifying.

In view of the expansion of Fifth Amendment privileges since its enactment, however, any enforcement of this provision would no doubt come under severe constitutional criticism.

The applicable case law has developed two separate results in this area. First, public employees may not be discharged solely for invoking and refusing to waive their constitutional right against self-incrimination and any testimony compelled by threat of dismissal from employment cannot be used in a subsequent criminal prosecution of the witness. *Uniformed Sanitation Mem. Assoc., Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 283–84, 88 S.Ct. 1917, 1919, 20 L.Ed.2d 1089 (1968). In *Garrity v. New Jersey*, 385 U.S. 493, 497, 87 S.Ct. 616, 618, 17 L.Ed.2d 562 (1967), a case involving the discharge of policemen for their refusal to relinquish the privilege, the Court held:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in

*Miranda v. State of Arizona*, 384 U.S. 436, 464–65, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice."

See also *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed. 574 (1967). Second, public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs. Thus, a public employee may be discharged for his refusal to answer specific questions relating to his official duties if he is also advised of the consequences of a failure to testify. But the answers he gives and the fruits thereof can not be used against him in any criminal proceeding. *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). *Uniformed Sanitation Men*, supra, 392 U.S. at 283–84, 88 S.Ct. at 1920; *Confederation of Police v. Conlisk*, 489 F.2d 891, 893–94 (1973), cert. denied sub nom. *Rochford v. Confederation of Police*, 416 U.S. 956, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

It is clear from the facts of this case that questions concerning Hatch Act violations would not relate to movants' official duties as Redevelopment Authority employees and they could not be subjected to future discharge or penalty for invoking a Fifth Amendment privilege.

**14.** I can not accept the government's contention that even if *Schofield* requires a showing of relevancy, it has submitted an affidavit which adequately demonstrates that the evidence it seeks is relevant. The affidavit, offered in support of its motion of April 14, 1977, for the enforcement of its subpoena, recites:

> "6. That the production of the subpoenaed documents and information and the appearance of the subpoenaed persons is essential and necessary for the Commission to carry out its investigative responsibilities and to determine whether a violation of 5 U.S.C. section 1502(a)(2) has been committed."

Such a conclusory statement will not suffice.

could possibly be subjected to a later charge of some abuse of process by one originally named as a target who, it is later discovered once the testimony is had and the documents are produced, really was needed only for informational purposes. Conversely, one could easily claim he had been prejudicially misled if he is termed an informational witness, and it is later determined that he should have been named a target. As with any prosecutor who should not bring a charge until he has fully investigated, the Commission should not be shackled with the burden of naming informational and target witnesses before being given a full opportunity to develop which is which.

   c.  Movants' due process right to effective assistance of counsel has not been violated.

■ The third point raised by movants is that their right to appear at the hearing with counsel under Section 1505 [15] is rendered meaningless if the Commission is permitted to subpoena the employee during an investigation without counsel and extract incriminating evidence from the witness at that time.[16] Once again, there is a short answer to this objection. In accordance with section 6(a) of the Administrative Procedure Act,[17] the Commission permits those compelled to appear before it the right to representation. Therefore, movants are assured of adequate protection in this regard.

   d.  These subpoenas have not been issued for the sole purpose of developing a criminal case and, therefore, are lawful.

**15.** That section provides, in relevant part:
    Either the State or local officer or employee or the State or local agency employing him, or both, are entitled to appear with counsel at the hearing under Section 1504 of this title, and be heard. 5 U.S.C. § 1505.

**16.** Movants' additional argument that their right to intelligently exercise their privilege against self-incrimination has been addressed in note 13, supra.

**17.** 5 U.S.C. § 555(b), which provides, in pertinent part:
    A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A

■ In addition to the civil penalties which can be imposed upon an employee who violates the Hatch Act, the same conduct may also subject him to liability under a number of criminal statutes.[18] From this fact, movants argue that if information obtained at the investigation level discloses an employee has unlawfully solicited political contributions, the Commission would be duty bound to turn that information over to the United States Attorney's office for criminal prosecution and, thus, the subpoenas *can be* used to develop a criminal case against any one of them. Simply because the information could be used to develop a criminal case should not cause the subpoena to be denied, however. Only where the *sole* objective of the investigation is to obtain evidence for use in a criminal prosecution will the court decline enforcement, *Donaldson v. United States*, 400 U.S. 517, 531–33, 91 S.Ct. 534, 543, 27 L.Ed.2d 580 (1971); *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964); *United States v. Bowman*, 435 F.2d 467, 469 (3d Cir. 1970), and the burden is on the one subpoenaed to show such a purpose. *United States v. DeGrosa*, 405 F.2d 926, 928 (3d Cir.), cert. denied 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969). In light of the fact that the Commission is not a criminal agency and that a proceeding under the Hatch Act is civil in nature, *Smith v. United States Civil Service Commission*, 520 F.2d 731, 736 (7th Cir. 1975), *Stewart v. United States Civil Service Commission*, 45 F.Supp. 697, 701 (N.D.Ga.1942), movants in this case have failed to sustain that burden.

party is entitled to appear in person or by or with counsel or other duly qualified representative in any agency proceeding.

**18.** E. g., 18 U.S.C. § 595 (interference by administrative employees of federal, state or territorial governments interfering with or affecting the nomination or election of a federal official); § 602 (solicitation of political contributions); § 603 (solicitation in room or building occupied in discharge of official duties; and § 607 (making political contributions). Although the government argued that these provisions would not apply to movants, this particular issue was not briefed by counsel and its resolution is not necessary to decide movants' objections to the subpoenas.

1204

### IV. *Conclusion*

The plain language of Section 1507, its legislative history the case law interpreting analogous statutes, and common sense all support the conclusion that the Commission possesses investigatory subpoena power prior to the holding of a formal hearing. The practical reasons for such a ruling are clear. If the agency's powers to investigate were as limited as movants suggest, its effectiveness in determining whether violations of the law had been committed would be badly crippled. Moreover, movants will not be denied the opportunity for effective assistance of counsel, they may invoke their privilege against self-incrimination should any questions reach a sensitive area, and, finally, this proceeding is civil in nature and is not being used solely to develop a criminal case. Accordingly, the motion to quash must be denied.